IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

BASIL A. CHAPMAN, LOWELL WARD,
WILLIAM SPEARS, WILLIE JACKSON, JR. and
UNITED STEEL WORKERS OF AMERICA,
AFL-CIO, CLC, on behalf of themselves and others
similarly situated,

                Plaintiffs,

v.                                          CIVIL ACTION NO. 3:04-0062
                                              (Consolidated with 3:04-00938)

ACF INDUSTRIES LLC; PROGRAM OF
INSURANCE BENEFITS FOR RETIRED
BARGAINING EMPLOYEES OF AMCAR
DIVISION OF ACF INDUSTRIES; and DOES 2
THROUGH 20,

                Defendants.

**MEMORANDUM OPINION AND ORDER REGARDING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs brought this action under Section 301(a) of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185(a). Plaintiffs claim that Defendant ACF Industries LLC (ACF) violated the Act by changing one of the health insurance programs for its retirees. Plaintiffs are members of the class of retirees, as certified by Order of this Court entered on March 25, 2005, covered by the Hospital and Physician Services Benefit Plan for Eligible Retired Employees and Dependents of ACF Industries, Inc. (H&P Plan). Defendants filed a Motion for Summary Judgment, asserting Plaintiffs cannot establish a right to unchangeable, lifetime benefits under the applicable contractual provisions. At issue are the collective bargaining agreements (also referred to as CBAs and Master Agreements) and related documents under which the H&P Plan for retirees was created and

maintained for the past thirty years.  Upon review of these documents, and for the following reasons, the Court finds Defendants are entitled to summary judgment.

# I.
# DISCUSSION

Employee benefit plans are divided into two categories under the Employment Retirement Security Act (ERISA): welfare benefit plans and pension plans. *Compare* 29 U.S.C. § 1002(1) *with* § 1002(2)(A).  "Unlike pension benefits, which are subject to stringent vesting requirements under ERISA, welfare benefits, such as health care insurance, are vested only if so provided by contract. 29 U.S.C. § 1051(1) (providing that ERISA's vesting provisions do not apply to employee welfare benefit plans)[.]" *International Ass'n of Machinists and Aerospace Workers, Woodworkers Div. v. Masonite Corp.*, 122 F.3d 228, 231 (5th Cir. 1997) (citations omitted).  Thus, as this case involves a health care plan, the Court must determine whether those benefits are contractually vested.

Here, because Plaintiffs' claims arise from a collective bargaining relationship with ACF, the Court must determine the parties' intent as expressed in their agreement. *District 29, United Mine Workers v. Royal Coke Co.*, 768 F.2d 588, 590 (4th Cir. 1985).  Rather than applying traditional rules of contract interpretation, however, the Court is obliged to apply the federal common law of labor policy. *Keffer v. H.K. Porter Co.,* 872 F.2d 60, 62 (4th Cir. 1989) (citing *Bowen v. USPS*, 459 U.S. 212, 220 (1983)).[1]  Section 301 of the LMRA provides not only

---

[1] In *Allied Chemical & Alkali Workers of America v. Pittsburgh Plate Glass Co.*, 404 U.S. 157 (1971), the Supreme Court held that the National Labor Relations Act ("NLRA") did not require employers to bargain with retirees concerning their benefits.  Recognizing that retirees and unions representing active workers did not always share the same objectives, the Court freed unions from any duty to negotiate on behalf of retirees and permitted employers to unilaterally change retiree welfare benefits, but with an important caveat.  The Court observed that if retirees' rights to welfare benefits were vested by contract, retirees could seek a remedy under Section 301.  The Court did not
(continued...)

jurisdiction in the federal courts but also authority to develop federal common law for uniform enforcement of collective bargaining agreements. *Textile Workers Union v. Lincoln Mills of Ala.*, 353 U.S. 448, 450-51 (1957). To interpret collective bargaining agreements, the Court must "'consider the scope of other related collective bargaining agreements, as well as the practice, usage and custom pertaining to all such agreements.'" *Keffer*, 872 F.2d at 62 (quoting *Transportation-Communication Employees Union v. Union Pac. R.R. Co.*, 385 U.S. 157, 161 (1966)).

The leading case in this Circuit is *Keffer*, and each party here cites language from *Keffer* in support of their opposing views. In *Keffer*, the Fourth Circuit affirmed the district court's decision in favor of retirees when their employer decided to terminate their insurance benefits which they claimed were intended to continue beyond the life of the CBA. The Court relied on three findings in combination: first, certain language in the CBA by which the coverage was initially provided; next, the continuation of that language and its effect in subsequent CBAs; and last, evidence of the conduct of the employer which indicated that benefits survived the expiration of the CBA. 872 F.2d at 62-64. The Court found this conclusion was "consistent with a more far-reaching understanding of the context in which retiree benefits arise." *Id*. at 64. The Court then quoted, with approval, the rationale adopted by the Sixth Circuit in *International Union, United Automobile, Aerospace & Agricultural Implement Workers v. Yard-Man, Inc*., 716 F.2d 1476, 1482 (6th Cir. 1983), which held that retiree benefits vested upon retirement and survived the termination of the CBA. The Sixth Circuit relied on the provisions of the CBA which included different language for the duration of retiree benefits from that of active workers and dependents. However, the Court also found the

---

[1](...continued)
elaborate on what contract principles applied or how rights were vested.

context in which retiree benefits arise to be an important factor. Retiree benefits are "a form of delayed compensation or reward for past services" for which retirees "would want assurance that once they retire they will continue to receive . . . regardless of . . . subsequent agreements." *Id*. *Yard-Man* inferred that such benefits were intended to continue so long as retirement status continued. This inference comes into play only when the agreement lacks specific language. The Sixth Circuit continues to follow *Yard-Man*. *See McCoy v. Meridian Automotive Systems, Inc.*, 390 F.3d 417 (6th Cir. 2004); *Maurer v. Joy Technologies, Inc.*, 212 F.3d 907 (6th Cir. 2000).

The inference favoring benefits, however, has been criticized. *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America v. Skinner Engine Co.*, 188 F.3d 130, 140 (3rd Cir. 1999) (stating "[w]e cannot agree with *Yard-Man* and its progeny that there exists a presumption of lifetime benefits in the context of employee welfare benefits"); *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 606-07 (7th Cir. 1993) (stating courts should "presume that a collective bargaining agreement ceases to obligate the employer when the agreement's term . . . is up"); *see also Stewart v. KHD Deutz of America, Corp*. 980 F.2d 698, 702 n.3 (11th Cir. 1993) (declining to resort to any inference to decide whether ambiguity existed). Although *Keffer* relies in part on *Yard-Man*, it does not expressly adopt the inference. Nevertheless, all the circuits have followed an approach similar to *Yard-Man* at least insofar as focusing on the collective bargaining context when examining the relevant contractual provisions. Courts also have examined in detail the language of the agreements to determine whether the parties' intent is unambiguously expressed. Agreements typically include clauses which define eligibility for, and termination of, coverage; reservations of rights on the part of the employer; and durational provisions. The agreement also

may be a series of documents, such as Collective Bargaining Agreements and Summary Plan Descriptions, used by the parties over the course of many years. Such is the case here.

This Court's task is to ascertain the terms of these documents to glean whether the parties' intent is unambiguously expressed. If the language is clear and no ambiguity can be found in the parties' agreement, as a whole, the plain meaning of that agreement controls. On the other hand, if the parties' intent is unclear because the agreement is ambiguous, the parties may offer extrinsic evidence to establish what the parties intended. "As with interpretation of the collective bargaining agreement generally, a court should consider extrinsic evidence of the parties' intent regarding the continuation of benefit provisions only when the terms of the contract are ambiguous." 20 *Williston on Contracts* § 55:27 (4th ed.) (footnotes omitted). A contract is ambiguous when it is reasonably susceptible to more than one interpretation. *Stewart*, 980 F.2d at 702; *see also Rossetto v. Pabst Brewing Co.*, 217 F.3d 539 (7th Cir. 2000) (applying a test based on latent or patent ambiguities).

With these principles in mind, the Court turns to the documents to begin its analysis. In their briefs, the parties provided the Court with numerous documents covering nearly thirty years. These documents include the Master Agreement and subsequent Agreements between ACF and the United Steelworkers of America; Insurance Agreements between the same parties; and Summary Plan Description booklets for the Hospital and Physician Services Benefit Plan for retirees. The company and the union have a long history of collective bargaining agreements embodied in the Master Agreement and subsequent Agreements. Dating back to at least 1975, when the company apparently agreed to pay the cost of health insurance for active and retired employees, the union and the company have successfully negotiated new collective bargaining agreements every two or three years. Contemporaneously with each new agreement, the company and the union executed

Insurance Agreements. These Insurance Agreements require the company to provide the health and life insurance programs for active and retired employees. The last group of documents is the Summary Plan Descriptions for the H&P Plan. These Summary Plan Descriptions appear to track the same time periods applicable to the Master Agreements and the Insurance Agreements.

The Master Agreement and subsequent Agreements are virtually identical insofar as they are pertinent to this action. In the body of these Agreements, the parties provide that the prior Master Agreement is replaced upon the effective date of the new Agreement and that the new Agreement will remain in effect for a period of years to a day certain, after which either party may give notice of termination.[2] Nowhere in the numbered sections of these Master Agreements do the parties discuss the retiree welfare benefits at issue here. However, along with other attachments such as appendices and supplements, the Agreements include Side Letters addressing a number of different topics. These letters are addressed to a union official, signed by both a company official and the union official, and dated the same date as the Agreement.[3] The letters relevant to the pensioners' H&P Plan read uniformly as follows: "This will confirm the understanding reached during the negotiations for the [1995] Agreement that the benefits provided for in . . . [the Summary Plan Description] will be continued without change during the term of the [1995] Agreement." In similar letters made a part of the Master Agreements, the parties also refer to the retirees' optional major medical program. In 1995, the letter addressing this coverage included, for the first time, the

---

[2]Section 27-1 of the Master Agreement between AMCAR Division, ACF industries, Inc., and Unites Steel Workers of America, March 5, 1975.

[3]See the letter dated October 24, 1995, on page 115 of the "Agreement between ACF Industries, Incorporated Huntington Plant and United Steelworkers of America. October 24, 1995," which is the first such letter the Court can find in the exhibits. Subsequent Master Agreements include the Side Letters until the 2003 Master Agreement.

statement that any employee who retires during the term of that Agreement would "contribute a flat $100 per month for life towards the cost of such coverage."[4] Prior to then, the company paid the full cost of the coverage.

With each Master Agreement, the union and the company executed Insurance Agreements. These Insurance Agreements appear uniform, only changing the applicable dates so far as relevant to the issues in this case. In Article 2.1, the Insurance Agreements require the company to establish a two-part program of insurance coverage–one for active employees and the other for inactive and retired employees. Article 2.2 states "[t]he Program is in substitution for the Prior Program" with certain exceptions.

A comparison of the 1972 version of the Insurance Agreement with the 1975 version, which began the company's obligation to pay the costs for retirees, is instructive. The 1972 Insurance Agreement provided that the company would establish the two-part insurance program–active and inactive/retired–but only pay for the active employees. The 1975 Insurance Agreement stated that "[t]he Company will bear the entire cost of the basic Program for active Employees, and the Program of benefits for pensioners and surviving spouses not eligible for Medicare." *Insurance Agreements*, at ¶ 2.3, in part. Each version also includes this paragraph: "5.6 The Inactive Group Insurance shall terminate on the same date that this Agreement terminates, unless at that time a new Agreement has been made with respect to such Inactive Group Insurance." *Id*. at ¶ 5.6, in part. In addition, each version included a life insurance benefit, which provides:

> The Company shall provide a life insurance benefit
> . . . with respect to any Employee who retires on or
> after [effective date of this Insurance Agreement] and

---

[4]See page 126 of the October 24, 1995 Agreement.

>during the term of this Agreement under the Company Pension Plan . . . without regard to whether an insurance agreement between the Company and the Union is in existence at the time of such retiree employee's death."

*Id.* at at ¶ 5.8. Lastly, each version states that it will become effective on a certain date and "remain in effect until" a termination date. *Id.* at ¶ 8.1.

The Summary Plan Description describes in detail the benefits under the H&P Plan for retirees. The Court understands that the pertinent language of the Summary Plan Descriptions has changed little over the years. Several provisions of the Summary Plan Descriptions are cited by the parties as relevant to the issues. For instance, the November 1, 1990, H&P Plan benefits for employees retired on or after March 5, 1980, has these provisions:

>**To each of the pensioners of ACF**. . . **who is eligible to participate in the Program:**
>
>This booklet describes . . . [the H&P Plan] which has been designed to give you protection until you are eligible for added benefits under Medicare. The Program is available to eligible pensioners . . . . The cost of this coverage is paid for entirely by the Company.
>
>\*   \*   \*
>
>**Eligibility**
>
>**3.0** You are eligible to participate in the Program if you
>
>**(a)** retire under the Company pension plan on or after **March 5, 1980** after completion of 15 or more years of continuous service . . ., or
>
>**(b)** are receiving a Surviving Spouse's benefit under the Company pension

>   plan as the Surviving Spouse of an employee
>
>   \* \* \*
>
>   **Termination of Coverage**
>
>   **3.18** Coverage of a pensioner and . . . Surviving Spouse's benefit . . . terminates on the earliest of:
>
>   **(a)** the day on which such person ceases to be eligible for coverage under the Program.
>
>   \* \* \*
>
>   **Summary Plan Description**
>
>   \* \* \*
>
>   **Plan Eligibility and Benefits**
>
>   You will be covered for Health benefits upon your retirement on other than a deferred vested pension.
>
>   \* \* \*
>
>   **Loss of Benefits**
>
>   You must continue to be a member of the class to which this plan pertains. . . . Benefits terminate upon eligibility for Medicare. In addition, the employer maintains the right to modify or terminate the plan.

*Summary Plan Description*, at introductory paragraph, 13, 17, & 24-25.

In the negotiations for the 2003 Master Agreement, the union and the company agreed to discontinue the H&P Plan for active employees, so no Insurance Agreement was executed with that Master Agreement. However, the retirees' H&P Plan was maintained by the company with important changes implemented in December, 2003. In a letter to retirees, the company advised that benefits would be subject to a lifetime cap and retirees would be charged a monthly contribution.

The letter cited the Summary Plan Description reservation of rights as authority to make the changes unilaterally and commented the company was under no legal obligation to provide the coverage at all. *Letter from Human Resources Department, ACF Industries, to Huntington Hourly Retiree[s]* (December, 2003).

The question presented is simple to compose–did the parties intend that a retiree's health insurance benefits vest upon retirement, so that the benefits may not be changed thereafter without the retiree's assent?  Unfortunately, neither party can point to an absolute expression of their intent. One might reasonably expect that the Master Agreement, the Side Letters, the Insurance Agreement, or the Summary Plan Description would contain a concise and explicit statement to the effect that retirees' benefits can or cannot be altered after retirement, yet none is found.  Instead, both sides argue that express provisions of the documents implicitly lead to the conclusion they each advocate.

The Master Agreement covers many topics but refers to pensioners' welfare benefits only in the Side Letter.  The Side Letter states the H&P Plan will be continued without change during the term of the relevant Master Agreement.  ACF's argument, that this is an express durational limit on the Plan, is reasonable, but so is Plaintiffs' argument.  Plaintiffs claim that this Side Letter means merely that anyone who retires during the term of the agreement is entitled to the Plan benefits in effect at that time.  Standing alone, then, the Side Letter and the Master Agreement do not unambiguously express the parties' intentions.  The Master Agreement has a general durational limitation which explicitly provides a specific term for the Master Agreement, but it may not be controlling as to retiree benefits for the same reason.

Courts frequently have been called upon to interpret clauses describing the duration of an agreement or benefits and reserving the right of an employer to alter or terminate the benefits.

-10-

Reservation of rights clauses, standing alone, have been found ambiguous. These clauses typically provide that the company reserves the right to terminate coverage at any time. Courts have considered that these clauses may be read to permit changes only for future retirees may be intended to preserve a company's right to make changes for those already receiving benefits. *See Jensen v. SIPCO, Inc.*, 38 F.3d 945 (8th Cir. 1994) (finding such a clause ambiguous on its face). General durational clauses which do not specifically refer to retiree benefits have been declared ambiguous and therefore not literally applied to prevent vesting. *See Maurer*, 212 F.3d at 917-18 (holding that general durational clauses for the entire agreement are not clearly intended to cover retiree benefits); *Masonite Corp.*, 122 F.3d at 233 (finding that language in the Insurance Benefit Agreements indicating they are subject to a "coincident" term with the CBAs was not specific to retiree benefits and would not affect vested benefits). Even when specific as to retiree benefits, these clauses may not expressly indicate whether the durational limit is meant to apply to current, or only to future, retirees. *Stewart*, 980 F.2d at 703-04 (finding contract ambiguous where language "does not specify whether the right to modify the plan after the CBA expires includes the right to adjust the benefits received by workers who retired under the plan or only permits . . . [the employer] to change the benefits future retirees will receive"). Other courts have accorded dispositive effect to durational clauses. *American Federation of Grain Millers v. International Multifoods Corp.*, 116 F.3d 976, 981 (2nd Cir. 1997) (holding that language in CBA stating "that retiree medical benefits could not be reduced 'during the term of this Agreement' . . . . unambiguously establishes that once the CBAs expired, . . . [the employer] was free to reduce retiree medical benefits"); *see also John Morrell & Co. v. United Food and Commercial Workers Intern. Union*, 37 F.3d 1302, 1307 (8th Cir. 1994) (stating that durational language is inconsistent with an intent to vest benefits for life (citations

omitted)). The inclusion of durational limitations for some provisions of the CBA, in contrast to the absence of similar durational limits in the retiree benefit provisions, was cited in *Yard-Man* as one basis for that court's conclusion that benefits survived the expiration of the agreement. 716 F.2d at 1481-82.

*Keffer* presented an analogous situation. There, the lower court determined that the relevant agreement set up two classes of benefits–one for active employees with a duration limited to the life of the agreement and another for retirees which continued until the retiree became eligible for Medicare. 872 F.2d at 63. In affirming the lower court's decision, the Fourth Circuit pointed out that the agreement expressly provided active employees' coverage "[d]uring the life of this Agreement" but had no similar language in the retiree provisions. *Id*. at 62-63. The Fourth Circuit contrasted this with the contractual provisions guaranteeing coverage for active workers and pensioners for the term of the agreement found in *Royal Coal, supra*, to limit the benefits to the life of the agreement. *Id*. at 63.

The Seventh Circuit also has addressed the effect of durational clauses in a number of cases. In *Bidlack*, the Seventh Circuit adopted a presumption against the vesting of lifetime benefits where the agreement is silent on their duration. 993 F.2d at 606-08. In *Rossetto*, the Seventh Circuit summarized its rules of law for interpreting CBAs, stating that "[i]f the agreement makes clear that the entitlement expires with the agreement, as by including such a phrase as 'during the term of this agreement,'" the plaintiff must show a latent ambiguity. 217 F.3d at 547. In an earlier case, *Pabst Brewing Co. v. Corrao*, 161 F.3d 434 (7th Cir. 1998), the court found the CBA unambiguous because it included the phrase "for the term of this Agreement" in the sentence requiring the company to provide retiree benefits. Similarly, in *Barnett v. Ameren Corp.*, 436 F.3d 830 (7th Cir.

2006), the court found benefits limited "for the life of the Labor Agreement," and thus not ambiguous. In *Cherry v. Auburn Gear, Inc.*, 441 F.3d 476 (7th Cir. 2006), the court reached the same result based on the phrase reading "during the period of this Agreement." Other circuits have reached similar results. *See American Federation of Grain Millers*, 116 F.3d at 981 (stating "'[d]uring the term of this Agreement'" necessarily establishes that once the agreement expires, so do the benefits); *Morrell & Co.*, 37 F.3d at 1307-08 (holding that retirement health benefits were not contractually vested in light of collective bargaining history and plain meaning of Master Agreements which lacked explicit vesting language and contained a durational clause); *see generally "Automatic" Sprinkler Corp. v. NLRB*, 120 F.3d 612, 618 n.4 (6th Cir. 1997) (finding "[e]ach agreement contains a 'duration of agreement' provision along with provisions concerning the renewal of the agreement that can be interpreted as giving to either party the right to terminate the agreement provided certain notice requirements are met"). These cases undoubtedly would preclude the use of extrinsic evidence and require judgment against Plaintiffs in this case based on the language found in the Side Letters and the Insurance Agreements.

The Insurance Agreements in this case require the company to establish the health insurance program for both active and certain inactive or retired employees. In the 1975 Insurance Agreement, the company undertook the cost of the plan for pensioners and surviving spouses not eligible for Medicare. *1975 Insurance Agreement*, at ¶ 2.3. The Insurance Agreement further includes an express durational limit for the Inactive Group Insurance it terminates on the same date that the Insurance Agreement terminates unless a new Insurance Agreement has been made for the inactive group. *Id*. at ¶ 5.6. Again, ACF points to this language as having only one reasonable meaning–that the retirees' insurance benefits last only through the term of the Insurance Agreement. While this

construction is certainly reasonable, the language may be susceptible to another reasonable construction, as proffered by Plaintiffs, when considered in the context of the other documents.

The Side Letter refers to the Summary Plan Description for the Plan. The Summary Plan Description language reasonably implies that coverage continues past the expiration of the Insurance Agreement and is paid for by the company. First, the introductory paragraph of the Summary Plan Description for 1978 ties the period of coverage to Medicare eligibility with no reference to the expiration of any agreement. The provisions entitled "When Coverage Ends" make no mention of a right to terminate the benefits of retirees already receiving them, but the "Termination or Amendment of Plan" section states unequivocally that the company may amend, modify, or terminate the plan at any time. This section, however, is contradicted by the Side Letter's statement that the plan would continue without change during the term of the Insurance Agreement. Read together, the Side Letter and the Summary Plan Description reservation of rights could be interpreted reasonably to mean that the benefits could be changed only for future retirees under a new Insurance Agreement.

If the Insurance Agreement contained no other relevant provision, the Court would be inclined to find the language ambiguous. However, upon close review of the balance of the Insurance Agreement, another provision dealing with retirees' benefits supplies an explicit statement of the parties' intentions as to what benefits survive the Insurance Agreement. The 1975 Insurance Agreement, by which the company first undertook its duty to pay the cost of pensioners' coverage, included a provision whereby the company agreed to provide a life insurance benefit for those pensioners who retired during the term of the 1975 Insurance Agreement. *Id*. at ¶ 5.8. Notably, the

parties' agreement makes it clear that the life insurance benefit survived the expiration of the Insurance Agreement. *Id.*

Every subsequently executed Insurance Agreement embodies this same language as to the life insurance benefit. This provision expresses the intent of the parties clearly: with respect to the life insurance benefit, when an employee retired during the term of a particular Insurance Agreement, the life insurance benefit vested and survived the expiration of the Insurance Agreement. No such language may be found in the Insurance Agreements with respect to health insurance benefits. The inclusion of this provision for the life insurance benefit makes the absence of similar language for the health coverage all the more significant. Had the parties intended the health coverage to vest and continue unchanged after the applicable Insurance Agreement expired, the language would have been the same for health insurance benefits. Given that such language is not included with the life insurance benefit, the Court finds that those benefits are not vested and may be changed without the retirees' consent.[5]

As the Court finds the Agreement unambiguous, it may not consider extrinsic evidence unless the evidence establishes some latent ambiguity. The extrinsic evidence offered in this case by Plaintiffs in their opposition to summary judgment consists of affidavits and deposition testimony. That evidence shows that Plaintiffs sincerely believed their benefits were fixed at retirement. Given that the collective bargaining between the union and the company produced a long series of agreements without an interruption in the health insurance benefits, Plaintiffs'

---

[5]Plaintiffs recently provided the Court with a copy of *Trull v. Dayco Products, LLC*, 2006 W.L. 1130926 (4th Cir. April 28, 2006) (unpublished), which they believe support their position. Although *Trull* reaffirms *Keffer* for the purposes stated above, the specific contract language in *Trull* clearly supports a finding of ambiguity which is not present here.

assumption is understandable. Further, none of the company's representatives who conducted pre-retirement interviews could establish that the retirees were informed that these benefits did not vest or become fixed at retirement. However, none of this evidence is sufficient to contradict the written agreements. Neither party produced evidence from the negotiators who first agreed that the benefit would be provided at the company's expense. The fact that one or more of Plaintiffs may have asked during the negotiations about his own retirement benefits is insufficient to overcome the written Agreement. Rather, at most, these discussions, as with parts of the agreements, could be interpreted as ambiguous, in that they are susceptible to two different interpretations. That is, one reasonable construction is that benefits did vest and thereafter could not be changed, but equally plausible is Defendants' version under which benefits are fixed and last only for a set period. Nevertheless, for the reasons stated, the Court finds the portions of the Insurance Agreement which this Court finds controlling are not ambiguous, and the evidence relied upon by Plaintiffs does not support a finding of latent ambiguity.[6]

---

[6]Plaintiffs also offer further extrinsic evidence which shows that ACF continued medical benefits for retirees during a strike in 1981 and a strike in 1987 and 1988. Plaintiffs argue that it can be inferred from this evidence that such retiree benefits were vested. In support, Plaintiffs cite *United Food and Commercial Workers Int'l Union v. Dubuque Packing Co.*, 756 F.2d 66, 69-70 (8th Cir. 1985) (finding "the agreements not unambiguous" and considering the fact that benefits continued when no bargaining agreement was in effect); *Bower v. Bunker Hill Co.*, 725 F.2d 1221, 1225 (9th Cir. 1984) (stating that there would be no ambiguity if the agreement specifically addressed the issue of vesting, but because there is no express language, a number of factors including the fact that retiree benefits continued during a strike period, precludes summary judgment); *International Union, United Auto., Aerospace and Agricultural Implement Workers*, 1982 W.L. 20483, *8-9 (W.D. Mich. 1982) (finding the continuation of paying retiree insurance premiums during a strike was an objective manifestation of a party's intent in absence of express language). However, the Court finds this evidence and these cases unpersuasive when applied to these facts because the Court has found the relevant portions of the Insurance Agreements in this case unambiguous.

## II.
## CONCLUSION

Accordingly, for the foregoing reasons, the Court finds that the benefits under the H&P Plan are not vested and, therefore, Plaintiffs cannot establish a right to unchangeable, lifetime benefits under the applicable contract provisions. Therefore, the Court **GRANTS** Defendants' Motion for Summary Judgment.

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER: May 9, 2006

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE